FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSLYVANIA

16 MAR 14 P3 5

MAGISTRATE NO. 1:16-mj-29
[UNDER SEAL]

## APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT

I, Michael Thoreson, being duly sworn, do hereby depose and state:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), in Erie, Pennsylvania. I have been a FBI special agent since February 2000. My main investigative focus has been in the white collar crime area, including mail fraud, wire fraud, bank fraud, identity theft, and bankruptcy fraud.

2. This affidavit is submitted in support of an application for a search warrant for Rick Weaver Buick GMC, 714 West 12th Street, Erie, Pennsylvania; Infinity Automotive, 2425 State Street, Erie, Pennsylvania; and 3709 Harbor Ridge Trail, Erie, Pennsylvania, there being probable cause to believe that the items described in Attachment A, being evidence of violations of Title 18, United States Code, Sections 1029 (Credit Card Fraud), 1344 (Bank Fraud) and 1349 (Conspiracy to Commit Wire and Bank Fraud) are located therein.

3. The information upon which this affidavit is based includes information obtained by your affiant during his investigation. Your affiant has also interviewed witnesses and law enforcement officers with information concerning this investigation.

## SUMMARY OF THE INVESTIGATION

4. Rick Weaver Buick GMC is an auto dealership with adjoining vehicle lots at 714 West 12th Street in Erie, Pennsylvania 16501. A large sign with the name Rick

Weaver is on the outside of the main business building.   Infinity Automotive, is a business with an adjoining lot at 2425 State Street, Erie, Pennsylvania 16501.   The building is concrete with a blue awning in front of the business.   The adjoining lot contains parked vehicles.   A sign with the name of Infinity Automotive is on the outside of the concrete building.   3709 Harbor Ridge Trail, Erie, Pennsylvania 16510 (Harborcreek Township) is described as a two story residence with a two vehicle garage attached to the residence.   It is part brick and part tan siding.   It has a textured driveway leading to the two vehicle garage.

5.   On or about May 15, 2015, Cooperating Witness 1 (CW1) informed the Erie Police Department that Adam Coover came to his/her place of business to look at the business and property that was for sale by CW1.   On May 22, 2015, Coover and CW1 signed a purchase agreement for the business and property.   The agreement spelled out certain terms for the purchase, including a $450,000 purchase price at $4,000 each month for 36 months.   The agreement appears to have been written and typed by Coover.   The agreement also stated CW1's American Express credit card would be immediately turned over to Coover so Coover could use it for business related expenses (Coover did not define business related expenses).   Coover would apply for his own business credit card after the business was formally purchased and transferred into Coover's name.   Coover wrote in the agreement, "Adam (Coover) will pay the bill on time or being that its in CW1 name CW1 can dispute those charges and say I stole the card and put me in jail for identity theft".   CW1 gave his/her credit card number to Coover after Coover stated he needed the number to check and verify the outstanding balance.   Coover advised he wanted to make sure there was not a large balance for which he would then be held

responsible.   Several days later, CW1 discovered Coover charged approximately $18,000

to CW1's credit card.   CW1 reported the fraudulent charges to American Express.

6.      On May 22, 2015, pursuant to the purchase agreement, Coover gave CW1

a $10,000 down payment in the form of a check written from Coover's Northwest

Savings Bank account.

7.      On May 24, 2015, CW1 discovered Coover maintained a Facebook page

labeling himself as president of CW1's company.

8.      On May 25, 2015, CW1 found out that Coover had sent some of his

friends to CW1's business to clean out office space.   CW1 stopped them.   Coover had yet

to provide a formal legal contract as detailed in the purchase agreement.   Coover stated in

that agreement he would have his attorney prepare the necessary documents and send

them to CW1.   Documents were never provided to CW1, as such, CW1 wanted to prevent

the cleaning or removal of CW1's property.   Furthermore, CW1 became concerned of

Coover's true intent after discovering the Facebook page and credit card charges.

9.      Around this same date, Coover told CW1 he/she needed to have nice

vehicles to use.   Coover told CW1 he/she could pick out a vehicle he/she desired and

Coover would make all the payments on the leases.   One vehicle would be for CW1 to

use, the other would be for the business. Coover was specific in that the vehicles would

be leased not purchased or financed.   Coover took CW1 to Rick Weaver Buick GMC in

Erie, Pennsylvania and introduced CW1 to Douglas Grooms.   Coover told CW1 to pick

out a vehicle he/she would like for himself/herself.   The other vehicle would be needed

for the business.   CW1 was taken to the office of David Alfieri, Finance Manager at Rick

Weaver Buick GMC where he/she signed contracts for two vehicles.   CW1 advised the

3

paperwork necessary for the lease of the two vehicles was already completed. CW1 did not assist in the preparation and does not know how or who completed the paperwork.

10.     CW1 advised he/she never told Coover or anyone else at Rick Weaver Buick GMC his/her income, nor did CW1 give consent for his/her credit to be checked. The two vehicles that CW1 purchased were a 2011 Chevrolet Silverado VIN 1GC4K0C85BF197809 and 2015 GMC Terrain VIN 2GKFLWEKXF6344938.

11.     On May 26, 2015, CW1 received a letter in the mail from GM Financial Leasing denying a loan for a $64,171 2015 GMC Yukon he/she had applied for on May 23, 2015. CW1 advised he/she did not consent or have knowledge of any application put forth in CW1's name nor CW1's company.

12.     During the month of May and June 2015, CW1 received three additional letters from various lenders all denying credit for vehicles in CW1's name and/or company. CW1 had no prior knowledge of the loan applications.

13.     CW1 advised at the same time he/she leased the two vehicles, Coover either purchased or made a prior deal with Grooms, while CW1 was present, to obtain three additional vehicles. Coover took custody of the three vehicles from Rick Weaver Buick GMC. CW1 has no knowledge of the transaction for these other three vehicles.

14.     On May 28, 2015, CW1 attempted to cash the $10,000 check provided to him by Coover on May 22, 2015. The bank advised CW1 that Coover's bank account did not have sufficient money to cover the check. CW1 then tried to take back the two vehicles to Rick Weaver Buick GMC after discovering he had purchased the cars, not leased them as disclosed to him. Grooms emailed CW1's attorney stating on behalf of Rick Weaver Buick GMC, he would gladly take the cars back, but at a reduced price.

4

CW1 would have lost thousands by accepting Grooms offer. CW1 reported his findings to Ally Bank, who had lent money for the purchases. CW1's attorney also sent a letter to Coover, advising him to make good on the two vehicles. Coover never responded. As of the date of this affidavit, Coover has never covered any of the costs associated with any promises and statements Coover made to CW1, nor has Coover purchased CW1's business.

15.     On January 11, 2016, the Pennsylvania State Police spoke with CW2. CW2 advised he/she was asked by Coover to purchase several vehicles that were then to be sold by Coover. CW2 was told by Coover it would be an investment, whereby CW2 would make a fifteen percent profit from the sale of each vehicle. CW2 stated he/she went to Rick Weaver Buick GMC and Dave Hallman Chevrolet, signed the paperwork and was out of the dealerships in five minutes or less.

16.     According to CW2, most of the vehicles were purchased by CW2 around the same time in August 2015. Several different lenders were used; however, most of the vehicles were purchased at Rick Weaver Buick GMC. Those include the following:

| | | |
|---|---|---|
| 2012 GMC ACADIA | 1GKKVTED9CJ376819 | Ally Bank |
| 2010 LINCOLN | 5LMJJ2J56AEJ10068 | Huntington National Bank |
| 2014 JEEP | 1C4BJWEG8EL170482 | Fifth Third Bank |
| 2015 CORVETTE | 1G1YT2D65F5604751 | GM Financial |
| 2010 CADILLAC | 1GYUKKEFXAR215736 | Ally Bank |
| 2009 CHEVROLET | 1GNFK23019R199507 | Ally Bank |
| 2013 MINI | WMWSY3C52DT593517 | First Commonwealth Bank |
| 2015 BUICK | 5GAKVCKD7FJ305690 | M&T Bank |
| 2012 FOREST | 4X4FXLL3XC5155430 | Erie Federal Credit Union |
| 2015 CADILLAC | 1GYS4CKJ3FR160635 | Ally Bank |
| 2015 CADILLAC | 1GYS4PKJ5FR507888 | Ally Bank |
| 2015 MUSTANG | 1ZVBP8EM4D5229348 | Ally Bank |
| 2015 GMC SIERRA | 1GT424E85FF613402 | Ally Bank |
| 2007 CADILLAC | 1GYFK66837R295101 | Unknown |
| 2014 CHEVROLET | 1GC1KXCG5EF141683 | Unknown |
| 2015 CHEVROLET | 1GC1KVEG0FF156398 | Unknown |

| 2012 CHEVROLET | 1GCPKSE7XCF141945 | Unknown |
| 2013 MINI | WMWSY3C52DT593517 | Unknown |

17. The total sum of the loans is in excess of $500,000. In your affiant's experience, purchasing multiple different vehicles around the same date, while using different lenders is a common tactic to keep the each lender ignorant of the other purchases. If the lenders knew of the other sales, they most likely would have asked additional questions and/or altered their final decision. Obviously the resources necessary for getting an auto loan for one vehicle are far different from the resources necessary for getting auto loans for multiple vehicles.

18. The investigation to date has determined that insurance from Progressive Insurance was obtained for several of the vehicles purchased by CW2 at Coover's request. The insurance policy was registered under Infinity Transport, 3709 Harbor Ridge Trail, Erie, Pennsylvania and not under CW2's name as one would believe if the vehicles were to be utilized by CW2. The policy holders included Adam Coover, Douglas Grooms, and CW2. The commercial auto insurance policy was opened on June 12, 2015, and cancelled four months later by Progressive for lack of payment. Based on your affiant's experience, persons buying vehicles at a dealership must provide proof of insurance upon purchase. Coover, through CW2, technically met that criteria, however, it appears Coover only obtained insurance to provide proof that insurance existed at the time of purchase. Upon execution of the deals, Coover never made payment because the auto insurance policy was no longer necessary to further the scheme to defraud.

19. Pursuant to this investigation, Ally Bank provided information that Infinity Transport, Douglas Grooms, and William Freeman also purchased or attempted

to purchase additional vehicles in 2015 using Ally Bank as a lender.  These include the following:

     2015 GMC ACADIA  1GKKVTKD1FJ363278
     2015 GMC SIERRA   1GT424E85FF613402
     2015 GMC SIERRA   1GTV2UEC9FZ229758
     2015 GMC YUKON   1GKS2CKJ7FR605930
     2015 GMC ACADIA  1GKKVRKD5FJ253966

20.     CW2 also advised that on July 31, 2015, an American Express credit card was opened in his/her name.  Over $10,000 in charges were made in less than 30 days.  CW2 found the credit card, in part, after checking his/her credit using an Internet service called Credit Karma.  Credit Karma allows a customer to examine their credit and look for discrepancies or possible problems.  CW2 noted that an email address of brandi_freeman05@yahoo.com was associated with CW2 on her Credit Karma report.  CW2 is not Brandi Freeman.  Your affiant knows that Adam Coover's spouse is Brandi Coover.  Furthermore, Brandi Coover's maiden name is Freeman.  Public records available to your affiant have revealed that Brandi Coover sometimes uses the name Brandi Freeman.  Coover lives at 3709 Harbor Ridge Trail, which is in Harborcreek.

21.     On November 16, 2015, American Express reported over $90,000 in charges were made using several American Express credit cards that were deemed by American Express to have been opened under suspicious circumstances indicative of identity theft.  Several different American Express accounts were opened under William Freeman, Gloria Coover, Brandi Coover, and Adam Coover.  After the accounts were opened and used, William Freeman contacted American Express and advised he did not know he had an account with them and did not authorize any purchases.  American Express contacted Adam Coover, who advised Freeman knew of the accounts and was

only stating the charges were fraudulent after a recent family dispute.  William Freeman the father of Brandi Coover (Freeman), spouse of Adam Coover.

22.    American Express advised that all of the aforementioned applications were received on June 3, 2015, from the same IP address.  Coover's application listed his occupation as CW1's company.  Purchases included over $24,000 at jewelry stores and $13,000 at a car dealership.    All of the accounts were closed by American Express, causing a loss in excess of $90,000 to American Express.

23.    CW3 reported to the Pennsylvania State Police (PSP) that he/she purchased several vehicles for Coover.  All of the purchases are believed to have been made in 2015 or 2016.  A search of Pennsylvania Department of Motor Vehicles records identified the following vehicles as purchased by CW3 in 2015 and 2016. The vehicles are as follows:

| | |
|---|---|
| 2013 CHEVROLET | 2G1FT1EW1D9144424 |
| 2016 GMC | 1GKS2CKJ3GR172236 |
| 2016 GMC | 1GT12UE84GF146770 |
| 2016 MERCEDES | 4JGDF6EE9GA662229 |
| 2006 DODGE | 1B3JZ69Z86V100844 |
| 2010 FORD | 1FMEU7DE8AUB02760 |
| 2013 MERCEDES | WDDJK7DA2DF008992 |
| 2016 CHEVROLET | 1G1FG1R72G0136791 |
| 2016 CHEVROLET | 3GCUKTEC2GG130724 |
| 2015 GMC | 3GTU2VEC5FG285584 |
| 2016 CADILLAC | 1GYS4HKJ8GR248983 |

24.    A search of the Pennsylvania Department of Motor Vehicles records for businesses owned and/or operated by Adam Coover found several vehicles were registered to Coover and/or his businesses. The vehicles are as follows:

| | |
|---|---|
| 2015 MERCEDES | 4JGDF6EE7FA600228 |
| 2015 CADILLAC | 1GYS4MKJ5FR739258 |
| 2016 MERCEDES | 4JGED6EB1GA022631 |

| 2015 ISUZU | JALE5W163F7302510 |
| 2015 GMC | 1GKS2CKJ7FR605930 |
| 2015 GMC | 1GTV2UEC9FZ229758 |

25.     Coover's businesses include Infinity Transport, Motorsports Galaxy, Coover Construction, Structure Development, Infinity Automotive, 2425 State Street, Erie, Pennsylvania, and C&G Real Estate, 3709 Harbor Ridge, Erie, Pennsylvania. Public records available to your affiant reveal Coover as the owner of each of these businesses. Coover claims on his personal Facebook page, in areas of that page available to the public, that he is the owner of both Infinity Automotive and C&G Real Estate. Coover also indicated on several loan applications as previously noted, that he was employed at Infinity Transport and Infinity Automotive.  Infinity Automotive and C&G Real Estate have Facebook pages. Infinity Automotive's Facebook page identifies the business as a seller of vehicles and vehicle parts.  Portions of the Facebook page open to the public include multiple photographs of vehicles, notes that vehicles are for sale, and includes photographs and notes about construction on Infinity's building and lot.  Several of the photographs included on the Facebook page show Pennsylvania license plates. Your affiant conducted a search of these license plates through the Pennsylvania Department of Motor Vehicles.  Pursuant to the results, several vehicles were identified as those purchased by the cooperating witnesses mentioned above.  As of the date of this affidavit, several vehicles purchased by CW2, which appear to be for sale, are located at 2425 State Street.  In your affiant's experience, businesses utilize computers along with keeping records of business transactions.   For Infinity, these records would include the purchase and sale of vehicles, to include those vehicles detailed in this affidavit.

26.     Public records and Coover's personal Facebook page (publicly available areas of the page) indicate C&G Real Estate's address is 3709 Harbor Ridge Trail, Erie, Pennsylvania.   This address is also Coover's residence.   As aforementioned, several vehicles have been registered in the name of C&G at the 3709 Harbor Ridge Trail address.   As previously stated, businesses must keep records of their transactions. Coover has detailed that C&G is based out of his residence, as such; transactions for C&G would most likely be stored at the residence.   Furthermore, since Coover owns Infinity Automotive, it is likely that Coover maintains records for Infinity Automotive at his residence.  Included in this search warrant application is the request for authorization to search computers and cell phones. CW2 and American Express both reported that a computer was used to apply for fraudulent credit cards.  Coover's Facebook postings and pictures could have been and most likely were posted using a cell phone.  Facebook allows users to take a photograph using their cell phone and then submit the photograph to their Facebook account.  Those photographs, unless deleted and overwritten, would most likely still be on the cell phone and even if they were deleted they may still be recovered with forensic software available to law enforcement.

27.     On December 11, 2015, CW4, who is employed at Rick Weaver Buick GMC, reported possible criminal activity by Coover to the Erie Police Department.  CW4 revealed that Coover purchased a vehicle from the dealership on September 30, 2015, for $62,771.15.  The check for $62,771.15 was returned due to insufficient funds.  CW4 advised Coover and the Owner/President of Rick Weaver Buick GMC, Adam Weaver, are personal friends.  Adam Weaver contacted Coover and asked Coover to make whole on the transaction, Coover failed to do so.  Erie Police followed up on CW4's complaint

after CW4 advised that Adam Weaver would need to be contacted as CW4 was not privy to the entire transaction. The Erie Police spoke with Adam Weaver who advised he was confused on why the report (complaint) was generated. The officer asked Adam Weaver to consider his options and get back with the officer if Adam Weaver wanted the officer to look into the allegations. Adam Weaver never contacted the officer again.

28.     On March 4, 2016, Ally Bank, which is FDIC insured, informed your affiant that their institution does not allow persons to purchase vehicles so they can then be held or sold by another person/party. Ally would consider this a "straw purchase", whereby the parties involved in the transaction keep hidden the true purchaser. Normally, "straw purchasers" do not make the loan payments, but the real purchaser/owner makes the payments on behalf of the "straw purchaser". Ally also advised that Ally considers multiple vehicle purchases at the same time by the same purchaser a material fact that should be disclosed by the prospective borrower, especially if the borrower is utilizing different lending institutions for each vehicle loan. Ally cannot make an educated financial decision without knowing all of the details. If a customer is purchasing several vehicles, that all require loan payments, the customer's income/debt ratio would drastically differ. Ally personnel have indicated that the finance manager at a dealership would have to be involved in the transactions, as such; the dealership would know they are sending out multiple different loan applications/proposals to various lenders for that same customer.

29.     In January 2016, Coover was charged by PSP for writing multiple checks to CW5 that did not have sufficient funds to cover said checks. Those charges are pending. CW5 has revealed to PSP that Coover was employed at CW5's used car

dealership and was responsible for purchasing and selling used vehicles. Coover was fired in May 2015, after CW5 discovered Coover had been stealing from early 2014 through May 2015. Part of Coover's scheme was to purchase vehicles and then obtain loans on the same vehicles from two different lenders in the form of dealer floor line loans. Car dealerships use floor lines to obtain funds from banks, which they then use to purchase vehicles for their fleet. Each vehicle purchased through the dealer floor loan system has its own separate loan within the main dealer floor loan. Once the dealership sells a particular vehicle, the loan for that vehicle is paid back using the proceeds from the sale. Banks sometimes keep titles for the vehicles as this prevents the dealership from selling the vehicles without the bank knowing and/or paying back the loans for those vehicles sold. The dealership cannot transfer title to the new vehicle owner without having the title. CW5 advised Coover obtained a dealer floor loan from NextGear Capital for several vehicles he purchased. NextGear required Coover, on behalf of CW5's business, to then provide the titles for the vehicles. However, after obtaining the NextGear loans, Coover then went to Erie Federal Credit Union and obtained additional loans on the same vehicles. Erie Federal Credit Union does not require that the titles be turned over. Coover was then able to take loans on vehicles twice, without the other lender knowing. As a result, CW5 was responsible for the loans and has incurred tens of thousands in losses. The investigation to date shows Coover took money from CW5 and then tried hiding the stolen funds by obtaining the fraudulent loans. Coover provided the aforementioned bad checks to CW5 in order to pay back the money he had taken. However, Coover's bank account did not have sufficient funds. The checks were

worth approximately $200,000. During Coover's tenure, he purchased at least one vehicle from Rick Weaver Buick GMC, that being VIN 3GNEK12Z86G100845.

30.     On February 29, 2016, Douglas Grooms pleaded guilty in United States District Court for the Western District of Pennsylvania, to Conspiracy to Commit Wire Fraud relative to his embezzlement of $485,800 from Community Chevrolet in Meadville, Pennsylvania. Grooms embezzled the money while employed as the General Manager for Community Chevrolet. The embezzlement occurred prior to Grooms taking the General Manager position at Rick Weaver Buick GMC. Grooms is scheduled to be sentenced on July 11, 2016.

31.     On March 2, 2016, law enforcement conducted surveillance of 2425 State Street.   Multiple different vehicles were parked at the business, including the following vehicles.  Due to the positioning of the vehicles, most of the license plates and or VIN's could not be identified.   Overall the lot contained over 20 vehicles.   Those vehicles include the following cars bearing the following VINS:

| | |
|---|---|
| 136370K183948 | Registered to William Freeman |
| 1GYFK66837R295101 | Registered to CW2 |
| KNMAT2MV6FP531216 | Registered to person living in Pennsylvania |
| 1G1YT2D65F5604751 | Registered to CW2 |
| 1GYUKKEFXAR215736 | Registered to CW2 |

32.     As previously noted, Coover made purchases from dealerships other then Rick Weaver Buick GMC. However, the investigation to date has indicated a significant number were done at Rick Weaver Buick GMC.  The investigation will obtain and examine the transactions from the other dealerships after the collection of documents from Rick Weaver Buick GMC. To do so before could harm the investigation.

33.     In summary, Grooms and Coover entered into an arrangement to sell and purchase vehicles.  Coover utilized "straw purchasers" to purchase several vehicles. Various lenders were used in an effort to keep hidden Coover's multiple "straw purchases".  The investigation has collected several of the sales contracts for the aforementioned transactions.  The collected paperwork does not contain a full accounting of what happened nor all of the paperwork that would have been generated; however, the paperwork shows the transactions were done and completed in part at Rick Weaver Buick GMC.

34.     Due to the nature of how Coover was working to keep hidden his involvement through the use of several "straw purchasers", it is likely that Coover used additional unknown "straw purchasers".  The FBI does not desire to gather every sale that was generated by Rick Weaver Buick GMC, but to carefully examine the known transactions and find those other transactions that were also done by Coover and his associates.

35.     A search warrant for the premises of Rick Weaver Buick GMC, 714 W. 12th Street, Erie, Pennsylvania, is requested due to the possibility of an employee(s) working at the dealership whom may have knowledge that the transactions were conducted with criminal intent.  Serving a federal subpoena for records is not sufficient in that records could easily be destroyed or not turned over to authorities.   Furthermore, a federal subpoena could be served on a department within Rick Weaver Buick GMC that would require an employee, who might be involved in the criminal activity, to turn over evidence thereby incriminating that person.   The FBI is investigating possible criminal conduct by several persons.  In order to accurately investigate the case and gather the

necessary evidence to either prove guilt or innocence, the FBI needs to have an accurate and unbiased gathering of the evidence. A federal subpoena fails to meet those criteria.

36.     A search warrant for 3709 Harbor Ridge Trail and 2425 State Street is requested to uncover paperwork for those vehicles known to have been purchased along with the other vehicles that may have been fraudulently purchased by Coover and his associates. As detailed previously, both addresses are used by Coover to operate his businesses.

## COMPUTERS

37.     This application seeks permission to search and seize records that might be found at 714 W. 12th Street, 3709 Harbor Ridge Trail and 2425 State Street, in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive or other electronic storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

38.     If computers or other electronic storage medium are found on the premises to be searched there is probable cause to believe that records related to this case will be stored in those computers or storage medium, for at least the following reasons:

a.     Such computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a

person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media, in particular, a computers' internal hard drives, contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      This application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for

evidence that establishes how computers were used, the purpose of their use, who used them, and when.

f.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, email, and financial transaction files), computer storage media can contain other forms of electronic evidence as well:

a.     Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is called for by this warrant to determine any party's role in perpetrating this fraud scheme.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

       c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

       d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand the evidence described in Attachment A also falls within the scope of the warrant.

39.     Searching storage media for the evidence described in the attachment may require a range of data analysis techniques.  It is possible that the storage media located on the premises will contain files and information that are not called for by the warrant.

In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, it is possible, though rare, for a storage medium to be organized in a way where the locations of all things called for by the warrant are immediately apparent. In most cases, however, such techniques may not yield the evidence described in the warrant. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. As explained above, because the warrant calls for not only records or data concerning the alleged fraudulent scheme but also records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

40.    Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media,

and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment.   This is true because of the following:

      a.     The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

      b.     The volume of evidence.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

      c.     Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will

be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.     Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

41.     Your affiant hopes to have FBI computer forensic examiners on hand at the Rick Weaver search site to image, on scene, the contents of any computer hard drives located at the businesses so that the evidence can be obtained by law enforcement with the most minimal interruption of business activity possible. If agents cannot obtain a mirror image of any hard drive on site, then the hard drive will have to be removed from the business so that a mirror image copy may be made offsite either at the FBI offices or at the PSP computer crime lab. Any hard drives removed from the business sites will be returned as expeditiously as possible provided that the hard drives do not contain illegal material which would prevent their return.

42.   In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impossible or impractical to image and/or search the hardware, media, or peripherals on-site for this evidence.

## Conclusion

43.   For all the reasons described above, there is probable cause to believe that evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1029 (Credit Card Fraud), 1344 (Bank Fraud) and 1349 (Conspiracy to Commit Wire and Bank Fraud)

will be found within Rick Weaver Buick GMC, 714 W. 12th Street, Erie, Pennsylvania; Infinity Automotive, 2425 State Street, Erie, Pennsylvania; and 3709 Harbor Ridge Trail, Erie, Pennsylvania.

44. The foregoing is true and correct to the best of my knowledge, information, and belief.

Michael Thoreson
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this _____ day of March, 2016.

Susan Paradise Baxter
United States Magistrate Judge

22